May it please the Court, Mark Walters for the Plaintiff Appellant, Eat Right Foods. The District Court erred in this case by finding latches on summary judgment, granting Whole Foods motion for summary judgment, and denying Eat Right's cross motion for summary judgment. Eat Right seeks reversal and judgment in its favor and remand for trial, Your Honor. Eat Right cross moved on Whole Foods latches defense because this just isn't a latches case. Invariably, latches involves a situation where the plaintiff sleeps on its rights, waits for the perfect opportunity to sort of pounce and take advantage of detrimental reliance. None of that is present here. We don't have the unreasonable delay that you see in a typical latches case. You also don't have the prejudice, detrimental reliance you see in a typical latches case. If we just set aside for a moment the party's dispute over actual awareness, when that happened and when it should have happened. If you just look at the fact that this case involved a proceeding at the United States Patent and Trademark Office for over a year prior to suit. That started off with a cease and desist letter to Whole Foods' exclusive licensee. Mr. Walters, what do we do with the fact of your client's email to the counsel at Whole Foods with regard to her visit to the San Francisco store in I guess it was late February or early March of 2010. It seems to me that that's the toughest fact you've got and the district court seized on in its assessment of when Eat Right was put on notice of the potential trademark infringement. Right, your honor. So I think if we look at that particular email, you have to read it in the entire context. And if you look at the very bottom part of that email, Ms. Douglas Clifford, the principal of Eat Right, says you should be on notice or you should know that Eat Right owns the trademark in Class 5 on food products. She submitted a sworn declaration saying that she noticed it on books and DVDs in the store in March of 2010, but that she did not see it on any food products. We actually don't know because the record is without any evidence about the use of the mark on food products in that particular store. The only evidence in the record about what happened on that day is from my client saying she didn't know. But I thought she was familiar. Doesn't she reference the Andy campaign, which, as I understood, the record was part and parcel of using Eat Right's slogan? So she testified in the record supports that she learned about the intent by Nutritional Excellence in November of 2010 to register the mark on food products. No, my question goes back to what she saw in February and March. As I understand it, the Eat Right campaign was a store-wide campaign involving a number of different single-ingredient foods, but it also involved education to the store's customers in the form of maybe, I don't know if they had videos or written material or whatever. But as I understand it, this was pretty prominently displayed throughout their grocery stores. Your Honor, so getting into the time frame of March of 2010, all we know is that she is from her declaration testimony, and the fact is is that she mistook that use that she saw. She didn't know anything at that time about the Andy program. She didn't know anything about what was going on with food products. How do we interpret then her closing statement about now would be the perfect time to place a large order for our cookies, which are not promotional materials, they're foods. She testified that she was well aware of users of the mark Eat Right on books and DVDs, and she thought when she saw that that it was being licensed by the American Dietetic Association, someone else who she knew used this on nutritional books and DVDs. Now she thought they're using it. So you're trying to draw a distinction between material and food? Is that what you're urging? Absolutely, Your Honor. And the trademark law... I don't understand her urging Whole Foods to order more cookies. Well, the trademark law requires us to look at the particular goods and services that the mark is used on. There's no conflict between the use of the mark on books and DVDs unless there's going to create a... I guess what I'm trying to get you to acknowledge is that by virtue of the fact that she applied it to ordering more cookies from Eat Right, that she understood the program to deal with foods in a grocery store, and that it wouldn't be just the Eat Right foods. What I'm struggling with here is that the question is, did she know or reasonably should have known, had she made diligent inquiry while she was there, that this trademark was being used throughout the store? So, you know, I think, Your Honor, it doesn't really matter necessarily if that was the actual time she knew or when she should have known. So you look at a time period here... Let's assume that the district court correctly drew the inference from her email that she knew. How does that influence your argument that there was no unreasonable delay here to which Latches should have... Because Latches is not a statute of limitations. I think that's the principal thing that happened here in this case, is the court applied it more like a three-year statute of limitations. If you look at that first email in March of 2010... It is a three-year statute of limitations under the Washington statute, right, for trademark infringement? I believe it's a trade name or a fictitious... But it is a three-year statute of limitations. Right, but we don't have a statute of limitations... When does the plaintiff know or with the exercise of reasonable diligence, could the plaintiff have determined that there was a potential infringing conduct by Whole Foods? But as an equitable defense, Your Honor, we don't stop with measuring the time period. We have to consider all of the circumstances. The statute of limitations is inherently a Latches defense, is it not? It's not, Your Honor. It addresses the same policy of the law, which is to prevent the loss of evidence, witnesses' memories going stale, witnesses' documents being destroyed. That's all inherent in a statute of limitations. It's a bit different in the trademark context, and here's why. Because trademark is about equitable principles. You don't just have these two parties who are arguing over use of the mark. You have the public that earns a right to assume and not be confused. So we don't strictly apply statute of limitations in a trademark setting because that would sometimes lead to unfair and inequitable results where the public is left confused over who is selling what and where it's coming from. Let me come at it this way. The district court also seemed to be influenced by the fact that one explanation for her delay in filing suit was that she was engaged in an attempt to get Whole Foods to acquire Eat Right, in other words, an acquisition, and that that was the motivation. At the same time, you're trying to negotiate a sale of your business to Whole Foods. You don't want to be suing them for trademark infringement. Well, you know, I think that that is, there's some surface appeal to that argument, but I think you have to look. Pretty strong motivation not to file. Well, you know, Your Honor, she is, at that point in time, engaging in direct negotiations with Whole Foods' licensee, and this is not just any licensee. This is a licensee that Whole Foods described in its counterclaims as a capital A affiliate, meaning one entity at which Whole Foods exercised some control over. So here she is engaged in adversarial proceeding at the U.S. Trademark Office. She has, wants to do business with Whole Foods, sure, but having an amicable relationship and leaving your options open, does that amount to a waiver, an acquiescence? It surely does not, Your Honor, and I think that's the problem. Let me ask this question, though. Whole Foods seems to me to repeatedly say, we don't want to buy the mark, right? And then they said it again. We don't want to buy the mark, right? So at what point should we make a determination that your client has to accept that they weren't going to buy the mark, and at what point is it becoming reasonable for there not to be a lawsuit filed? Because there doesn't appear to be anything in the record that would suggest at any point Whole Foods said, you know, we might be interested. It seems like they repeatedly said no, and then no, and then no again. Right. And, Your Honor, I think that you surely can't go on forever, and this is where we get into weighing the factors of when this latch is appropriate. There are a number of factors that you need to look at. The district court did not look at those, at least in this order that we see. So you're saying if we look at perhaps like the second or third no, then you would still be within the three-year time frame? Well, Your Honor, it's sort of, I think we need to avoid putting ourselves, what would we do? What do we think is an appropriate way to behave? But it's an equitable remedy. At some point, part of it involves some common sense application, which means at some point your client has to accept the no. Right. And the question is, at what point do they accept the no, and then that acceptance, or at least reasonable acceptance, would start this clock for the presumption as it relates to the latches. So, I think that's why prejudice is so important here, Your Honor. This is a situation where there is no evidence of prejudice. First of all, we had an erroneous finding. It wasn't harmless error that there was actual knowledge in 2009. Oh, that's right. It said it spent millions of dollars on the campaign and thousands of man hours developing and implementing it store-wide. It took them months to unravel everything and shut it down. But there's no evidence, Your Honor, that any of that was connected to the absence of a lawsuit. You sent demand letters, and then Whole Foods said, okay, we'll terminate this thing by the end of the year. But it was never terminated. That was the problem, okay? And so we had to file suit to get that termination, ultimately. And there was no monetary remedy, and Whole Foods asked Eat Right to seek a monetary remedy from Nutritional Excellence. They were unable to satisfy the monetary damages. I think it's very important to look at... Did your client at one point ask Whole Foods to fund its litigation against the other party? I can't remember, Nutritional something, or Nutritional Excellence? I'm not sure about that, Your Honor. I think she did. At least I saw that in the record. I think, Your Honor, these are all sort of getting away from the key point that we need to find some prejudice here. This is a situation where in 2009 there was no use, yet some unaggregated number was relied on by the district court. The district court found that for prejudice... I thought the program started in early 2010. The program started in 2010, but the court found... But she saw at least some of these promotional materials in her visit to the San Francisco store, right? Right, Your Honor, but the court in finding prejudice just relied on a number that said from 2009, presumably all of 2009, up through 2012, that a block amount of money was spent on sales and on expanding the store. There was no infringement in 2009, so on that point alone, we've got a finding of... We don't know how much was in 2009 versus the rest of the years. Okay. I mean, I'm assuming that it took months to get this thing ramped up, right? But you're right. Whole Foods did not break out the numbers for us, so we don't know what they spent in 2009 versus what they spent thereafter. Let me ask a different question. I did not see anything in the record where your client suggested any kind of a standstill agreement to toll the running of any statutes of limitation while they negotiated. That's the thing, Your Honor. Was there ever a request made to do that? There isn't a statute of limitations, and I think that's important. She engaged outside trademark counsel as soon as she understood there was a potential threat to her brand. This outside trademark counsel wrote to Nutritional Excellence and ceased and demanded that they stop using... Would you concede that the three-year clock starts running with the issuance of a cease and desist letter? Against Nutritional Excellence, I would, Your Honor. So my question remains, I think your answer is there was never a suggestion that the parties stand down to stop the running of the statute of limitation while they negotiated this acquisition? There wasn't, Your Honor. And I think that trademark owners are in a real tough position when it comes to enforcing their rights. They can't, and they practically sue everybody at the same time if you have a situation. This is the critical fact that makes this case different from any of the cases relied on by Whole Foods, is that there was this lengthy trademark opposition where Eat Rights was prosecuting its claims in an adverse way to Whole Foods. Whole Foods understood that there was this potential claim. It thought it was threatened with litigation. Yeah, there was this stuff in the background where she said, hey, why don't you try and buy our mark as a way to solve these claims? But that's her savvy negotiation, and it's not necessarily... Maybe she should have stopped sooner, but there's no prejudice as a result of that. They all knew all along that this was an issue. One more point, Your Honor. Standard of review. We have a difference on the standard of review here. This is on factual findings where there's a dispute, there's a de novo standard of review. If you read their brief, it reads like a brief after a jury trial where you're trying to find evidence to support the finding. Critically, there's a Seventh Amendment right to a claim for trademark infringement. And this issue comes up where people want to bifurcate a laches defense, and that's... If you read the Danjack case cited in the briefs, Judge McKeon was very careful to say, you know, we had a bifurcated trial on laches in this case, but that's not going to be how we do things in every case because you have a Seventh Amendment right where you have these interwoven issues. You can't be making a finding apart from that jury determination. So that's... That influences your standard of review here on these factual disputes. Thank you, Your Honor. Okay. Thank you very much, Mr. Walters. Good morning, and may it please the Court. I'm Steve Moline for the appellee, Whole Foods Market. Chief Judge Martinez exercised sound discretion in applying the equitable doctrines of laches and acquiescence to the undisputed facts in this case. His decision was correct, and it certainly wasn't an abuse of discretion. I'm just saying, are you suggesting that there can be no reasonable interpretation of the facts that would allow for the district court, a district court, to find that Eat Right was motivated by an attempt to resolve this case short of litigation as it relates to cost, which would be an excusable reason for the delay, right? If there's a possibility of a reasonable interpretation of the facts in that regard, wouldn't it be improper for the district court to make that type of determination at the stage that it did? I think we need to distinguish between a reasonable interpretation of whether any facts are disputed and what the result of those undisputed facts are. The application of laches based on the facts, which are undisputed, and... There's a dispute about the motivation. There is a dispute right here about what was Eat Right's motivation in terms of trying to resolve the case or basically lull Whole Foods into some sense that it wasn't going to do anything. I mean, that's not an agreed upon fact, right? There are disputes about the motivational aspect to Eat Right's negotiations, aren't there? I think to the extent that you're talking about what was her state of mind, there may be a dispute over what she actually knew, but we're not relying on what she actually knew. We're relying on the fact that she said she went into Whole Foods, she saw the mark, and at the very least, she should have known at that point that she had a cause of action. All she would have had to do was walk through the rest of the store, and the judge found that she knew or should have known. I'm talking about whether or not, again, as counsel pointed out, it's not a strict statute of limitations. There can be excuses, excuses, right, or justifications for delay, so while we rely upon the analogous three-year statute, if there was a finding that, in fact, there was reasonable delay, right, wouldn't that factor into the determination about the ruling in this case? Absolutely. If the district court had, in his discretion, found that their delay was reasonable, that would have been within his sound discretion. There's no question about that, and I would not be standing here asking you to overturn that decision. That's not what he found. He exercised his discretion to the undisputed facts and found that she knew or should have known before the three-year analogous statute of limitations, which, as you correctly noted, it's not a strict statute of limitations in trademark cases, but it's the only remedy that a defendant has when the plaintiff delays bringing its claim. That and other equitable defenses like acquiescence, which I'd also like to talk about a little bit here. But isn't the determination about when she knew a separate factual determination about the motivation for engaging in negotiations and not bringing the lawsuit, those seem to be two separate factual findings, are they not? I don't believe her motivation in not bringing the lawsuit. Her internal motivation. I'm not talking internal motivation, but in terms of Representative Eatright, there's a case law that says that if a party decides not to bring litigation because of determinations about litigation costs in the context of bringing the lawsuit and tries to resolve things short of that, that that could potentially be a reasonable delay or justified, correct? Yes. Those are all facts that a district court could consider in making the determination of whether he or she believes the delay is reasonable. The other thing I'd like to point out here is this is not a typical summary judgment case. I'd also like to address the Seventh Amendment argument, which I literally just heard for the first time. Appellant waived any argument that they're entitled to get a jury trial on latches and acquiescence. They affirmatively argued below that both defenses should be decided on summary judgment and they weren't entitled to trial on either. I'd like to read just a short quote from their brief below. Both defenses are applied in the discretion of the trial court. There is no right to a jury on either defense, even if they involve underlying facts in dispute. This court, the district court, can resolve the applicability of both defenses on summary judgment. I mentioned I'd like to talk about acquiescence. I think that latches has been covered very well in the briefs. Maybe before you move on to acquiescence, you can just discuss prejudice on the latches because I guess I'm stuck a little bit there in trying to understand. Maybe you need to just help me with the standard. Is it that had she alerted you all, I don't know, let's say that in March of 2010, that you guys wouldn't have done any, you know, you wouldn't have incurred any of the costs because it seems like probably you would have. I can't imagine that, you know, some, I don't know. It seems like a small company. You don't think Whole Foods would have just rolled over for her is what you're saying? Yeah, that's I guess what I'm saying. I think that's a fair statement. I think we would have fought it. So prejudice is an element of both latches and acquiescence. And what you have to show there, it's not, it's a pretty low standard, frankly, from the other cases. If you can show that there was an unreasonable delay, the only way that an unreasonable delay is not going to constitute latches or acquiescence is really if there's a very minimal finding or no finding at all on prejudice. Here the fact that once she knew, so once she knew or should have known, that starts a period that we're going to determine whether the delay was unreasonable. That was more than three years. There's a strong presumption the delay was unreasonable. So any actions that Whole Foods took to either build the mark, invest in the mark, spend money on the campaign, and most importantly for me is if we look at the Whitaker case, it talks about they subjected themselves to additional potential liability by continuing to use the mark while plaintiff waited to sue. And that's exactly what happened here. At the very least, if she would have sued us... Sorry. Go ahead, Your Honor. I just want to make sure I got the legal standard right in my own mind. Isn't it though that you've got to show that, well, had we been alerted sooner, we would have done things differently? And it seems like... I don't believe that is the standard, Your Honor. Okay. So... I don't think any of the cases stand for that. I think the cases say that you don't have to affirmatively prove that we would have stopped when you... Like immediately when you thought you had a claim. That's why the cases don't say when you... But it's all very pretentious though by her not telling you if you would have done the same damn thing anyway. That's what I don't understand. Well, that's the thing. We never had a chance to decide whether to do the same damn thing anyway. We... But wait a minute. But didn't you at some point... There was some indication, there were communications saying, we think that there's an issue here and your client became alerted to that. And that certainly wasn't at the end of the three-year period, right? That was certainly at some point in the early part of the three years, the first year at least. I'd actually... That's a very good point. I'd actually like to address that by... And I'm not just moving into my outline, I promise. But I think what really gets at that, the answer to that question is the acquiescence prong. She was sending very mixed signals. As you mentioned, she kept saying, you should buy my brand. Please buy my brand. Your investment in the E-Write Mark has helped my brand. You should buy it. You should buy my brand so you can take care of the nutritional excellence problem. But at the same time, as she was... When she first started saying, oh, wow, there might be a problem here, she emailed us and said it was not her intention to threaten Whole Foods. She said it was a pleasure to supply Whole Foods, who she called a mutual customer of her company in nutritional excellence. There's the fantastic to see email that Judge Solomon noted already. She said she benefited from the huge investment made by Whole Foods in the marketing of E-Write. She told us she wanted Whole Foods' interest protected and even potentially enhanced. So wait, but these are sophisticated individuals who are lawyers. It seems to me that you're saying that your client didn't at some point recognize that when these overtures were buffed, that there might not be the possibility of litigation. I mean, that seems to me to be a little bit difficult of an argument to make. But yes, she's saying those things because she's trying to solicit a bid for the mark. And are you saying that it would be not foreseeable by your client, that if those overtures were not actually accepted, that there wouldn't be a resort to litigation? I think foreseeable to your client gets really into the crux of what the issue here is, which is the standard of review. The appellant's arguments are largely disagreements with the district court's analysis. They're not disagreements over any disputed facts. And what we have is a clear delay exceeding the statute of limitations period. We have a strong presumption. And we have no reason to overturn the district court's sound discretion. You know, it's not necessary to try to figure out what would Whole Foods have done or what was Whole Foods thinking. All of the actions and all of the words that give rise to the acquiescence claim as well as the latches claim are from Ms. Douglas Clifford's own emails and her own deposition testimony. Mr. Milleen, I'm a little bit concerned, though. You mentioned the email where Whole Foods bristled at the concept that they might be drug into litigation. At that point, Whole Foods clearly knew that Eat Right was taking action before the patent office to challenge Nutritional Excellence's infringement, right? Well, so what – Whole Foods – I will agree with part of that, and I'll explain what I don't agree with. Well, let me finish the question so you can – Sure. Okay. Sure. So if that's true, then why wouldn't the company have thought, geez, we're engaged in this program with Nutritional Excellence to market all our foods through the Andy Eat Right program. If she's got a beef with Nutritional Excellence, we could be in trouble here to the extent that there is an agreement that there's an infringement. Sure. And the answer to that is the part that I don't agree with in the premise. She challenged Nutritional Excellence's new applications for – they were intent to use trademark applications to register the mark for very specific snack food products. They did not challenge Eat Right's existing registrations that covered the type of educational programs, computer programs, and online educational programs that really were the heart of what we were doing with Nutritional Excellence. I think it's also important to understand Whole Foods was not branding any products as Eat Right America products. This was a program that said Eat Right America, there were Andy scores, which stands for Aggregate Nutritional Density Index. Basically, it tells you how healthy a food is on this one scale. But I thought I saw the Eat Right model – I'm not sure what you call it, brand name – Logo. Let's call it. Logo. Thank you. On an Andy card that would have been posted right next to the food item. That's exactly right. And in fact, there are some – you'll see pictures of containers of bulk almonds, for example, or pinto beans that have an Andy score on them. And we were required under the license agreement that when we used Andy scores in that program, the Eat Right America mark had to appear as well. But what you're seeing there – I'm not sure that the distinction you're trying to draw as between promotional materials and food helps you much if the logo was being used on both. But the point is that they did not – I'm not trying to make a distinction that somehow we were not using the mark in connection with food. The distinction I'm trying to make is that she, in her opposition in the Patent Office against nutritional excellence, she was not focused on the program. She was focused on new intent-to-use applications for specific snack products that would have been branded as Eat Right America snack products. At the time, wasn't Whole Foods using the Eat Right slogan on food items throughout its stores? So the trademark lawyer in me has to disagree with that. They were using it as part of – Let me – But yes, the mark appeared on containers. If she turned left at the aisle containing the promotional materials and run into the first food item that she saw that was part of the Andy program, she would have seen an Eat Right slogan on the Andy label, would she not? Absolutely, Your Honor. Okay. And she would have seen signs hanging in the stores, in the aisles promoting the program. And in fact, she admitted that by a little bit later on, she knew that Whole Foods was using the mark on food. And in fact, before the three-year deadline of December 3rd, she wrote to Nutritional Excellence and said that they were supplying a mutual customer. So she knew that our affiliation was with Nutritional Excellence and not anybody else. Is there anything in Record Counsel that would support this idea that your client was aware of the differences between the Eat Right program in its store versus what was being challenged in the patent trademark office? Because you've raised that, but is there anything in the record that says that your client understood that or relied upon that or focused on that in any way? I don't think that it appeared in the record that we relied on that or focused on that. And I think that, again, gets back to the point that it's not really about what Whole Foods, you know, what our mentality was in dealing with this mark. No, I understand that as it relates to the burden and your arguments about sort of the burden. I'm just wondering. You raised this issue about this being significant, and I'm wondering if there was anywhere in the record that indicates that your client also thought it was significant in terms of differences between what was being challenged or not. The only reason I thought it was significant, Your Honor, was to respond to the argument that we somehow should have been on notice when they opposed a completely different application. My time is up. I'd be happy to answer any additional questions. I don't have anything further. Thank you, Mr. Miller. Thank you, Your Honors. Thank you, Your Honor. I'd like to address your question about. I'll give you two minutes on rebuttal. Okay. Thank you. About prejudice and the standard. The case we believe that's on point there is Internet Specialties, the 9th Circuit case does require some sort of causal connection between the absence of a lawsuit and the expenditures. That says you can't just submit evidence of general expenditures during the time period of the infringement and say that's legal prejudice. You need to draw a line. There was no line. It couldn't have been drawn in this case because Whole Foods had contractually agreed by August of 2012 to stop. Now they didn't completely stop, we found out, but they were under a contractual obligation that we had nothing to do with to stop. So it's not a situation where you see in these typical laches cases where you look at the infringer, they built a business around something and, oh, now they have to stop using. They had already agreed to stop. So this is a case where there can't be a finding of prejudice on that fact alone. What about the resources that are expended between 2010 and 2012? Even if they're not disaggregated, I mean, you're not saying there were no resources spent during that period of time. I think it's probably highly unlikely there were no resources expended during that part of time. But as you know, there's a significant startup expense to any new thing. So the fact that they're disaggregated gives us no ability to take out that 2009. On this idea about the store, we don't know that there was any use on food products in that store. This was March of 2010 when she sent that email and says she was in a Whole Foods store. She says she didn't see any use on food products, didn't think there was any use on food products. But she didn't look, right? I mean, her testimony was, I made a beeline for the interior manager's office and I never turned left. Right. That's her testimony. She had no reason to think that there was infringement. But it doesn't make any sense that you would have the promotional materials out, but then no food item listed there. Well, yes, it does, Your Honor, because this was a whole program about, you know... Is there a reasonable inference that I can draw from the fact that they put the logo on the promotional materials that she and Mitch saw? So we're talking about what she saw. She said she saw books and DVDs and promotional files. But it makes no business sense for the food store to put out the promotional materials if they're launching a major food campaign without assuming that they also posted these ... So this is the difficulty drawing these factual inferences, because there's a lot more, Your Honor. That's a perfectly plausible inference to draw under Ick-Bulver's... Your Honor, there's nothing inconsistent with use on books and DVDs on a weight loss program that's going to be completely apart from actually branded food use. Let me ask you a question in a different way. If you cross-move for summary judgment, you assume that there were not material facts that were in dispute. So what's wrong with the district court making a perfectly plausible inference from facts that you concede? Well, I don't think it's a plausible inference, number one, because... Well, assume for the sake of my hypothetical that it is. Where does that leave you? Well, so the problem there, Your Honor, and by cross-moving for summary judgment, we certainly did not waive our right on the standard of review or the right to have, if the judge was leaning... You know, the losing party always makes that argument when there are cross-motions for summary judgment, but that's a hard argument to make after you've lost. Well, Your Honor, the reason is here is we have a laches defense that is so intertwined with these factual findings, and it is... There are facts that bear on this idea. How could you ever make a statute of limitations ruling or a laches ruling without looking at facts? I mean, it's inherently a factual, fact-intensive legal conclusion, is it not? Right, Your Honor, and I think we are entitled to advocate in a way to say that you cannot read those facts to support laches, and that's all we did. But you would concede that the district court can, if the facts are stipulated by both sides as being... If they're stipulated. ...no material... Well, cross-motions for summary judgment. Yeah, that's not the same thing, Your Honor. The district court could make a laches or a statute of limitations. We're saying that you can only read it our way. They're saying you can only read it their way. Are you saying in your cross-motions you had different undisputed facts that were settled? Correct. I mean, we had... That's what you're saying. Yeah, you know, it's, you know... He just threw you a lifesaver.  Thank you, Your Honor. I think the last point that I will touch on is this idea that by sending or by enforcing rights against nutritional excellence in an administrative proceeding at the Patent and Trademark Office, that we didn't at the same time put Whole Foods on notice that they were using a mark that was infringing our rights. That's not a credible argument. Well, there is some suggestion of that in Ms. Douglas' email, is there not? I mean, that's what caused the general counsel from Whole Foods to bristle when she suggested that there might be infringement. Well, that bristling, Your Honor, shows notice and subjective belief on his part that the  They have an adverse claim against Whole Foods. By me or I'm going to sue you for trademark infringement? Is that what I should do? I'm sorry, Your Honor? Either by me or I'm going to sue you for trademark infringement? No, it was, here's a way to settle these claims. And now that's a perfectly valid way. Claims being infringing conduct. Correct, Your Honor. Now that's a perfectly valid way to negotiate a settlement of a claim would be for, and it happens, I tell you, more often. It's a difficult proposition, though, when you're trying to convince the putative defendant to buy your company, is it not? I think it was more, if you want to sell Eat Right branded food products, we have the exclusive right to sell Eat Right branded food products, Whole Foods. And if you really want to sell Eat Right branded food products, then you need to buy our rights. That is a perfectly reasonable and legitimate offer, and that's all that happened in this case, Your Honor. Okay. Thank you very much. I let you go over good arguments on both sides. Thank you all very much. The case just argued is submitted. We'll take a 10-minute recess. Ms. Morris, could I see you in the roving room?
judges: Tallman, Watford, Boulware